IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM PANAS et al. | : | |
|     Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA et al., | : | NO. 10-cv-05248 |
|     Defendants. | : | |

MEMORANDUM ORDER

AND NOW, this 14th day of May, 2012, upon consideration of Defendant City of Philadelphia's Amended Motion for Summary Judgment (Doc. No. 30) and Plaintiffs' Response in Opposition Thereto (Doc. No. 32), it is hereby ORDERED that said Motion (Doc. No. 30) is GRANTED IN PART and DENIED IN PART.  Specifically, the City's motion is GRANTED as to Plaintiffs' state law claims (Counts IV, VI, VII, and VIII) and DENIED in all other respects.

I.  Factual Background and Procedural History[1]

On November 21, 2009, then-Philadelphia Police Officer Frank Tepper ("Tepper") murdered Billy Panas following a scuffle between some of Tepper's family and friends and a group of neighborhood youths in front of Tepper's house.  Tepper was off-duty at the time, hosting a baby shower for his step-daughter.  Tepper had been drinking, and when he shot and

---

[1] Because this matter comes before us on Defendant City of Philadelphia's motion for summary judgment, we set forth the facts drawing all justifiable inferences in favor of the Plaintiffs.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (remarking that "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" in resolving motions for summary judgment).

1

killed Panas, Tepper had a blood alcohol content (BAC) of approximately 0.078% to 0.087%.[2] (See Doc. No. 30, Ex. C).

Prior to shooting Panas, Tepper exited his house, flashed his badge, identified himself as a police officer, and asked the hostile crowd to disperse. (See Doc. No. 30, Ex. A). They did not comply, even after Tepper pointed his gun at several of them. (See Doc. No. 32, Exs. AA, BB, CC, DD, EE, FF, GG, HH, II, JJ). When Billy Panas said, "he won't shoot anybody," Tepper replied "oh, yeah?," pointed the gun at Panas, and shot him point-blank in the chest. (See id.; Doc. No. KK). Later that night, doctors at Temple University Hospital pronounced Panas dead. (See Doc. No. 32, Exs. MM, NN).

Tepper has a checkered history on the police force. Taking Plaintiffs' evidence as true, as we must for the purposes of this motion, Tepper had a troubling propensity for off-duty drunken violence which went largely unchecked by the Police Department. For example, in the early morning hours of April 19, 1995, Tepper was off-duty, in partial uniform, and drinking in a bar. After leaving the bar, Tepper took offense to a passing motorist's comments to Tepper's fiancee. In an apparent fit of anger, Tepper attempted to stop the car by reaching through the window, trying to remove the keys from the ignition, and trying to shift the car into "park." The driver, Keith Anderson, sped off.

Unsuccessful but undaunted, Tepper chased the car in his private vehicle through the streets of Philadelphia. During the pursuit, Tepper repeatedly struck the rear bumper of Anderson's car and tried to push it into an intersection, through a red light. Tepper eventually

---

[2]Pennsylvania Department of Transportation regulations recognize that an individual with a BAC of 0.04% is medically disqualified from performing "safety sensitive functions." (Doc. No. 30, Ex. C). The legal limit for driving in Pennsylvania is 0.08%.

pulled in front of Anderson's vehicle and jumped out.  Tepper drew his gun, approached the car, and proceeded to pistol-whip Anderson.  Later on, Tepper lied about what happened to Internal Affairs (IAD) investigators.  Tepper received a slap-on-the-wrist (a 2-day suspension), despite the fact that the investigation revealed that "Officer Tepper's version of events . . . seem to be lacking the whole truth" (to say the least).  (See Doc. No. 32, Exs. WWWW (Stine Expert Report summarizing evidence); UU, at 18).

In an ominous portent of things to come, the investigator noted that Tepper should have contacted on-duty police instead of taking matters into his own hands.  (See Doc. No. 32, Ex. UU, at 19).  Similarly, Tepper's 1995 annual review reflects the Department's awareness of Tepper's overly aggressive off-duty behavior:

> [Tepper] is self-motivated an [sic] very aggressive in the area of enforcement.  It is this aggressiveness that needs to be tempered with moderation. . . . Officer Tepper needs to pay closer attention to the rules and regulations of the Police Department, in particular those dealing with off duty incidents and conduct.  It is this latter concern that has caused Officer Tepper to have a disciplinary action pending against him.

(Doc. No. 32, Ex. XXXX).  Despite this admonition, Tepper's reviewer somehow concluded that Tepper had "performed all of his duties in a satisfactory manner."  (Id.).  In fact, Tepper received good reviews all throughout his tenure as a Police Officer.  (Id.).

In the winter of 2000, Tepper beat up two boys because they were throwing snowballs outside of his house.  This incident came to light in 2002 when one of the boy's mother complained about a more recent altercation between her son and Tepper.  It is unclear what, if anything, the Department did in response to these allegations.  (See Doc. No. 32, Ex. WWWW (summarizing evidence)).

Also in 2000, Tepper pointed a gun at a 10-year-old boy who was bouncing a basketball in the playground near Tepper's house. (See Doc. No. 32, Exs. XXX, YYY). Apparently, the bouncing ball had disturbed Tepper's sleep. The boy told his mother, who then confronted Tepper and asked why he pointed a gun at her son. Tepper, who was sitting on the front steps of his house with his gun in hand, replied "Who the fu-k are you?" and then went inside. The boy's mother reported the incident to police, but no one ever followed-up with her. (Id.).

In May of 2002, Tepper learned that a boy named Eddie Barr had bullied Tepper's young son in the playground across the street. Tepper (again, off-duty and drinking (See Doc. No. 32, Ex. WWW)) grabbed his pepper spray and gun and ran outside in search of Barr. But Tepper could not find Barr, so he returned home and called the police to file a report. Instead of waiting for police to arrive, Tepper went back outside looking for Barr. Like before, Tepper had no luck, but he ran into a group of teenagers and got into a fight with them instead. Tepper pepper sprayed the teenagers, pulled his gun, and said "yeah, I'll shoot you, I'll shoot all of you, I don't care." (See Doc. No. 32, Exs. WWWW (summarizing evidence); CCCC, EEEE, FFFF). Fortunately, Tepper did not shoot anyone that day, but the parallels between this event and the Panas murder are obvious.

Tepper was not disciplined for his role in this incident, even though he violated the Commissioner's Memo regarding off-duty police actions, (See Doc. No. 32, Exs. WWWW (summarizing evidence); VV, OOOO, RRRR, SSSS, TTTT), and even though the IAD investigator found Tepper to be less-than-truthful once again. (See Doc. No. 32, Ex. VV, at 6). In addition, following this most recent altercation between Tepper and the teens, numerous Department officials essentially predicted Panas' murder:

> As a result of this investigation, it has been determined that [Tepper] acted in accordance with departmental policy. However, it would have been prudent to have called 9-1-1 to report the assault [on Tepper's son] and get back-up before interceding. His actions, reacting to intense emotion about the welfare of his son, could have resulted in an *escalation of the incident without back-up likely resulting in injury or the use of deadly force*.

Captain Mark T. Everitt. (Doc. No. 32, Ex. OOOO) (emphasis added).

> It should be noted however that the actions taken by P/O Tepper although immediate and seemingly understandable could have resulted in *numerous injuries with the very real possibility of deadly force being used by him during the confrontation*. P/O Tepper would have fared better with the assistance of on-duty police officers as opposed to the situation which led him to face a hostile crowd of youths alone.

IAD Inspector Aaron Horne. (Doc. No. 32, Ex. VV) (emphasis added).

> It should be noted that the actions taken by P/O Tepper although immediate and understandable, could have resulted in *numerous injuries with the very real possibility of deadly force being used by him during the confrontation with a hostile group of youths*.

Captain Deborah D. Mateffy. (Doc. No. 32, Ex. RRRR) (emphasis added).

Note the subtle change in wording between IAD Inspector Horne's report of November 11, 2002, which hesitantly labels Tepper's actions as "seemingly understandable," and later reports by Captains Everitt and Mateffy, which both state without qualification that Tepper's conduct was "understandable." (Doc. No. 32, Exs. VV, RRRR, SSSS). Ultimately, all recommended that no disciplinary action be taken against Tepper.

Later in 2002, Tepper's use of force triggered another red flag. According to a departmental alert dated August 27, 2002, Tepper had *eight (8)* use of force incidents in the preceding year. (Doc. No. 32, Ex. PPPP). The alert reflects that *three (3)* or more incidents during a twelve-month period "indicates that the officer may need to be reviewed for a potential

problem." (Id.). We cannot tell from the record what, if anything, the Department did about this "potential problem," or why the system did not flag Tepper's use of force earlier. In fact, it appears that the Department did nothing in response to Tepper's conduct except to "counsel" him about his off-duty actions. (Doc. No. 32, Ex. SSSS).

Finally, in 2010, the Police Department fired Tepper after he murdered Billy Panas. The Department charged Tepper with, among other things, violating the Commissioner's Memo on off-duty police actions, the very same infraction that apparently warranted no discipline in years' past. (Doc. No. 32, Ex. UUUU).

Billy Panas' parents brought this civil suit against Tepper and the City of Philadelphia ("City" or "Philadelphia") seeking recompense for their son's death. The Panas' complaint asserts both federal constitutional claims pursuant to 42 U.S.C. § 1983 and state law tort claims. The City has moved for summary judgment, arguing that it cannot be held responsible for Panas' murder either under state law (because the City enjoys immunity from tort claims) or federal law (because no reasonable jury could conclude that a City custom or practice caused Panas' death, as required under Monell).

As explained herein, we agree with the City as to the Panas' state law claims, and we grant summary judgment on those claims accordingly. However, construing the facts in the light most favorable to the Plaintiffs, a jury could reasonably find that Tepper was a menace to the community, especially when "off-duty" and drinking; the Police Department knew about the problem but had a practice of ignoring or minimizing it; the Department's failure to adequately train, supervise, or discipline Tepper effectively emboldened him to continue misusing his authority as a police officer, particularly while "off-duty" in his neighborhood; and the

Department's (in)action constituted deliberate indifference with respect to those who crossed Tepper's path, including Billy Panas, and ultimately caused Panas' death.  Thus, Plaintiffs' Monell claim must survive summary judgment.

II.   Legal Analysis

    A.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), we must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Specifically, summary judgment is appropriate where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  Anderson, 477 U.S. at 252.

    B.   State Law Claims Against the City of Philadelphia

Plaintiffs' complaint against the City alleges various claims sounding in state tort law, including assault and battery (Count IV), negligence (Count VI), wrongful death (Count VII), and survival (Count VIII).  The City contends that Pennsylvania's Tort Claims Act immunizes the City from such claims, and Plaintiffs do not argue otherwise.  On this point, we concur with the City and therefore grant its motion for summary judgment on Counts IV, VI, VII, and VIII.

The Tort Claims Act provides broad immunity to the City of Philadelphia against tort claims.  The Act states, in relevant part:

> Except as otherwise provided in this subchapter, no local agency shall be liable

>for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person.

42 Pa. Cons. Stat. § 8541.

"The clear intent of the Tort Claims Act was to insulate the government from exposure to tort liability," so "[t]ort immunity is a non-waivable, absolute defense." McShea v. City of Philadelphia, 995 A.2d 334, 341-42 (Pa. 2010).  This sweeping immunity bars "any suit involving an injury, whether the injury is physical, mental, reputational or economic, . . . unless the suit falls within one of the eight exceptions . . . contained in section 8542(b)." E-Z Parks, Inc. v. Phila. Parking Auth., 532 A.2d 1272, 1276-77 (Pa. Commw. Ct. 1987).  These eight exceptions, which delineate the limited waiver of immunity, include: (1) operation of motor vehicles; (2) care, custody, or control of personal property; (3) care, custody, or control of real property; (4) dangerous conditions of trees, traffic controls, and street lighting; (5) dangerous conditions of utility service facilities; (6) dangerous conditions of streets; (7) dangerous conditions of sidewalks; and (8) care, custody, or control of animals.  42 Pa. Cons. Stat. § 8542(b)(1)-(8).

Further, the injury at issue must have been "caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties" for the immunity waiver to apply.  § 8542(a)(2).  Since "negligent acts" do "not include acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct," id., the Tort Claims Act shields local government entities from liability for the intentional torts of their employees.  See Thomas v. Cianfrani, No. 01-3096, 2009 WL 1704471, at *4-5 (E.D. Pa. June 17, 2009) (noting that "a local agency retains its governmental immunity for damages alleged as a result of crimes,

actual fraud, actual malice, or willful misconduct."); Heckensweiler v. McLaughlin, 517 F. Supp. 2d 707, 719 (E.D. Pa. 2007) (observing that "Township is categorically immune from any intentional acts."); Holmes v. City of Philadelphia, No. 05-2909, 2005 WL 1875524, at *3 (E.D. Pa. Aug. 4, 2005) (recognizing that the Tort Claims Act "expressly bars recovery against a municipality for intentional torts, including any acts which constitute 'a crime, actual fraud, actual malice or, willful misconduct.'"). Relevant to this suit, the City of Philadelphia is a "local agency" and therefore covered by the Act's immunity provisions. Cianfrani, 2009 WL 1704471, at *4 (noting that "the City [of Philadelphia] is protected by sovereign immunity.").

Here, the Tort Claims Act precludes Plaintiffs' assault and battery claim against the City because the City has immunity for such intentional torts. See § 8542(a)(2); DeBellis v. Kulp, 166 F. Supp. 2d 255, 277-78 (E.D. Pa. 2001) (finding Allentown police department and the city of Allentown immune from state law intentional tort claims, including assault and battery); Moser v. Bascelli, 865 F. Supp. 249, 252 (E.D. Pa. 1994) (holding that "[s]ince battery is an intentional tort, and the acts alleged in the complaint describe willful misconduct on the part of [a police officer], the Police Department and . . . Township are immune from any lawsuit grounded in battery."). In addition, Plaintiffs' negligence claim does not fall within one of the eight narrow exceptions to the City's immunity from negligence suits, so this claim also fails as a matter of law. See Cianfrani, 2009 WL 1704471, at *4-5 (concluding that Tort Claims Act affords immunity to City of Philadelphia against claims of negligent hiring, retention, and supervision of police officers). Finally, the Tort Claims Act similarly bars Plaintiffs' wrongful death and survival claims against the City. See Bornstad ex rel. estate of Bornstad v. Honey Brook Twp., No. 03-CV-3822, 2005 WL 2212359, at *21-22 (E.D. Pa. Sept. 9, 2005) (opining that "wrongful

death and survival actions sound in tort and are governed by the Tort Claims Act.");
Heckensweiler, 517 F. Supp. 2d at 718-19 (dismissing wrongful death and survival actions against Springfield Township on Tort Claims Act grounds).

In sum, we grant the City's motion for summary judgment as to Counts IV (assault and battery), VI (negligence), VII (wrongful death), and VIII (survival) because Tort Claims Act immunity protects the City against such claims.

C. 42 U.S.C. § 1983 Claims Against the City of Philadelphia[3]

In addition to the aforementioned state law claims (from which the City is immune), Plaintiffs also assert federal law claims pursuant to 42 U.S.C. § 1983 seeking redress for the City's purported transgressions of the United States Constitution, in particular the Fourth and Fourteenth Amendments, in connection with Billy Panas' death. Section 1983 provides a private cause of action for the violation of constitutional rights:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .

42 U.S.C. § 1983.

As evident from the text of the statute, there can be no § 1983 liability unless the wrongdoer acts under color of law. Traditionally, "acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made

---

[3]The City of Philadelphia and its police department are one and the same for § 1983 purposes. See Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 n.4 (3d Cir. 1997) (directing courts to "treat the municipality and its police department as a single entity for purposes of section 1983 liability.").

10

possible only because the wrongdoer is clothed with the authority of state law.'" West v. Atkins, 487 U.S. 42, 49 (1988) (citations omitted). But "a defendant in a § 1983 suit [also] acts under color of state law when he abuses the position given to him by the State." Id. at 49-50. For example, one who acts under "pretense" of law, i.e., "one who is without actual authority, but who purports to act according to official power, may also act under color of state law." Barna v. City of Perth Amboy, 42 F.3d 809, 816 (3d Cir. 1994).

In that same vein, "off-duty police officers who purport to exercise official authority will generally be found to have acted under color of state law." Id. Manifestations of such pretended authority include, among other things, flashing a badge or identifying oneself as a police officer. Id.; see also Mierzwa v. United States, 282 Fed. App'x 973, 977-78 (3d Cir. 2008) (non-precedential) (same); Bonenberger, 132 F.3d at 24 (opining that "off-duty police officers who flash a badge or otherwise purport to exercise official authority generally act under color of law" for § 1983 purposes).

Here, the City argues that Tepper was not acting under color of law at the time of the incident because he was off-duty, he had been drinking, he used a personal weapon, the dispute was of a personal nature, he was at his own home, and he never made any attempt to arrest anyone. We agree that these factors weigh against a finding that Tepper acted under color of law. However, it is undisputed that prior to shooting Panas, Tepper flashed his badge and announced that he was a police officer while attempting to clear the crowd in front of his house. Given these exhibitions of official authority, a jury could reasonably conclude that Tepper was, in fact, acting under color of law during the Panas incident. See Pryer v. City of Philadelphia, No. 99–4678, 2004 WL 603377, at *3-7 (E.D. Pa. Feb. 19, 2004) (holding that "the undisputed presence of

11

manifestations of police authority (flashing a police badge and using a state-issued weapon) could suggest to a reasonable fact-finder" that police officer acted under color of law in shooting someone, even though officer was off-duty at the time, never attempted to arrest the victim, and shot the victim because of a personal dispute).  As such, we cannot grant summary judgment for the City on this ground.

But this is not the end of our inquiry.  The Supreme Court has established that a local government such as the City of Philadelphia "may not be sued under § 1983 for an injury inflicted *solely* by its employees or agents." Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658, 694-95 (1978) (emphasis added).  In other words, a municipality cannot be held liable for its employees' bad acts on the basis of *respondeat superior*.  Instead, a local government may face § 1983 liability only if its "policy or custom" inflicts the injury.  Id.  Courts have elaborated on this basic premise in myriad ways to address the innumerable circumstances in which § 1983 claims arise, but the general idea is always the same: *the government itself*, through its policies or practices, must be sufficiently culpable before we impose § 1983 liability upon it.  See Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 403-04 (1997) (holding that "a [§ 1983] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."); Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) (To prevail, § 1983 plaintiff must establish that "the municipality was the 'moving force' behind the injury alleged.") (citation omitted).

In the Third Circuit, the seminal case defining the contours of a City's § 1983 liability for the misconduct of its police officers is Beck v. City of Pittsburgh, 89 F.3d 966 (3d Cir. 1996).  In

Beck, the Third Circuit reversed the district court's grant of judgment as a matter of law in favor of the City of Pittsburgh. Id. at 967-68. Factually, Plaintiff Robert Beck alleged that a Pittsburgh police officer "engaged in police brutality and used excessive force against him while making an arrest, and that the City of Pittsburgh's custom of tacitly authorizing its police officers to use excessive force resulted in Beck's personal injuries." Id. at 967. According to Beck, the officer "struck him in the face six to eight times with the end of his gun, pulled Beck from the car, forced him to the ground, and kicked him in the ribs." Id. at 968.

      Like Tepper, the offending police officer in Beck had been the subject of several citizen complaints. Specifically, the officer in Beck had "five complaints of excessive use of force in less than five years." Id. at 972. And like Tepper, the officer in Beck was hardly ever disciplined for his actions. See id. at 970 (Noting that "[n]one of the . . . complaints was sustained and none of them resulted in discipline. None of these dispositions was overruled by the Chief of Police or his assistant. However, the Police Department did discipline [the officer] once.").

      Legally, the Beck court recognized that "custom" for § 1983 purposes may "be established by evidence of knowledge and acquiescence." Beck, 89 F.3d at 971 (citation omitted). The court then reaffirmed that "to sustain a § 1983 claim for municipal liability, the plaintiff must 'simply establish a municipal custom coupled with causation-i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury.'" Id. at 972 (quoting Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990)). The Beck court also held that the written complaints alone "were sufficient for a reasonable jury to infer that the Chief of Police of Pittsburgh and his department knew, or should have known, of" the officer's violent

conduct. Id. at 973.  In addition, the mere fact that the Police Department had procedures in place to investigate citizen complaints could not "shield the City from liability."  Rather, the "investigative process must be real.  It must have some teeth." Id. at 974.  In the end, the court concluded that "Beck presented sufficient evidence from which a reasonable jury could have inferred that the City of Pittsburgh knew about and acquiesced in a custom tolerating the tacit use of excessive force by its police officers," which precluded judgment as a matter of law for the City on Beck's § 1983 claim.  Id. at 976.

Also, although "causation can be established only by demonstrating that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences," Berg, 219 F.3d at 276, the Third Circuit has cautioned that the question of causation is often for the jury.  See Bielevicz, 915 F.2d at 851 ("As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury.").  More specific to this suit, "it is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future," so such tolerance may provide the necessary causal nexus in a § 1983 action.  Id. at 851-52.

Here, a reasonable fact-finder, viewing the facts in the light most favorable to Plaintiffs, could very well believe that Tepper routinely engaged in violent and dangerous "off duty" conduct, in particular while drinking and dealing with situations involving his family and/or teenagers in his neighborhood.  (See "Factual Background" section, *supra*).  The Philadelphia Police Department not only knew about these numerous instances of misconduct (via, e.g., citizen complaints), but *explicitly acknowledged* that Tepper's off-duty escalation of minor disputes may have *deadly consequences* in the future.  See id.; Beck, 89 F.3d at 973 (citizen

complaints put police department on notice of officer's violent propensities).

Further, a rational fact-finder could certainly conclude that the City had a custom of turning a blind eye to the deeply troubling behavior of officers such as Tepper instead of disciplining, counseling, training, and supervising Tepper appropriately. After all, the record reflects that the Department rarely disciplined Tepper, and never severely so, even though he repeatedly lied to IAD. (See "Factual Background" section, *supra*). Thus, a fact-finder could reasonably infer that the Department's tolerance of Tepper's behavior emboldened him to continue misbehaving throughout his tenure as a police officer. See Bielevicz, 915 F.2d at 851-52 (recognizing that "it is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future."). And considering the similarity between Tepper's prior off-duty incidents and the circumstances surrounding Tepper's murder of Billy Panas, a jury believing the Plaintiffs' evidence could rightfully conclude that the City could have foreseen and prevented Panas' death at Tepper's hands. In this regard, the facts here are analogous to those in Beck in which the Third Circuit declared that awareness "of similar unlawful conduct in the past" plus the "fail[ure] to take precautions against future violations" exposes a government entity to § 1983 liability when that failure caused, at least in part, Plaintiffs' injuries. Beck, 89 F.3d at 972. In sum, a reasonable jury could decide that the City of Philadelphia, through the customs of its Police Department, bears sufficient culpability for Panas' death to hold the City itself liable under § 1983 as interpreted by Monell and its progeny.

III.    Conclusion

For the aforementioned reasons, we GRANT Defendant City of Philadelphia's motion for summary judgment (Doc. No. 30) as to Plaintiffs' state law claims (Counts IV, VI, VII, and VIII)

and DENY the motion in all other respects.

                        BY THE COURT:

                        /s/ Legrome D. Davis

                        Legrome D. Davis, J.